# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| Mark Berube, on behalf of himself and all others similarly situated, | Civil Action No.: |
| Plaintiff, | |
| vs. | |
| Rockwell Automation, Inc., the Rockwell Automation Employee Benefits Plan Committee, and John/Jane Does 1–20, | CLASS ACTION |
| Defendants. | |

## COMPLAINT

Plaintiff Mark Berube, by and through his attorneys, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, alleges the following.

## INTRODUCTION

1.      This is a class action against Defendant Rockwell Automation, Inc. ("Rockwell"), the Rockwell Automation Employee Benefits Plan Committee (the "Committee"), and the individual members of the Committee (collectively with Rockwell and the Committee, the "Defendants") concerning the failure to pay benefits under the Rockwell Automation Pension Plan (the "Plan ") in amounts that are actuarially equivalent to a single life annuity ("SLA") to participants and beneficiaries receiving a joint and survivor annuity ("JSA"), as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").  By not

offering JSA benefits that are actuarially equivalent to the SLA, Rockwell is causing retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      Rockwell sponsors the Plan for its employees.  Generally, plan participants accrue pension benefits in the form of an annuity for the life of the participant. Participants can also receive their pension benefits in other forms, including—but not limited to—a JSA, which provides an annuity during the participant's life and then a percentage of that amount to the participant's spouse after the participant's death (50%, 66 2/3%, 75% and 100%).

3.      ERISA requires that these JSA benefits be "actuarially equivalent" to the SLA Participants could select at the time they begin receiving benefits.  Two benefit types are actuarially equivalent if the present value of the payment streams for each benefit are equal. *See* 29 U.S.C. § 1055(d)(1)(B) and (2)(A)(ii).  The present value of an annuity is calculated by a formula that takes into account the participant's (and, where applicable, the beneficiary's) age and includes assumptions about mortality and a discount rate.  The mortality assumption addresses the likelihood that each successive monthly payment will have to be made, and the discount rate takes into account the time value of money.  To determine actuarial equivalence, the same factors (age, mortality and discount rate) must be applied to each benefit stream, and the selected assumptions must be reasonable as of the date the calculation is performed.

4.      The Plan attempts to conform to ERISA's actuarial equivalence requirements by using formulas to calculate the amount of various alternative benefit forms that are based on actuarial assumptions set out in the Plan document.  For some of the subplans, these actuarial assumptions are specified; in others they are not.  In either event, however, the selected mortality table and interest rate are used to calculate "conversion factors." The conversion factor is then applied to the normal form of benefit to determine the monthly amount a Participant will receive

if he or she selects, for example, a JSA. However, the Plan's conversion factors are not based on ***reasonable*** actuarial assumptions, because the assumptions used by the Plan have not been updated in decades and are no longer accurate. The monthly benefit amounts received by Plaintiff and other class members are less than the actuarial equivalent of the SLA they could have selected when compared to benefits calculated using ***reasonable*** actuarial assumptions.

5. The Plan's outdated actuarial assumptions adversely impact the benefits Plaintiff and the Class receive because mortality rates have generally improved over time with advances in medicine and better collective lifestyle habits. People who retired recently are expected to live longer than those who retired in previous generations. Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables. As a result, using an older mortality table decreases the present value of certain benefits, such as JSAs, relative to SLAs, and — interest rates being equal — decreases the monthly payment retirees receive if they take their benefits in these alternative forms.

6. The interest rate also affects the calculation. Using lower interest rates — mortality rates being equal — decreases the present value of benefits in forms other than an SLA.

7. The Plan is comprised of several sub-parts which use different formulas to calculate "actuarially equivalent" benefits. For example, the Allen-Bradley Salaried and Represented Hourly Sub-Part (the "A-B Sub-Part") uses varying tabular conversion factors — based on the age of the participant and the age of the spouse — to calculate conversion factors for determining most (i.e. 50%, 66 2/3% and 100%) JSA benefits. The Plan does not state the actuarial assumptions used to calculate the conversion factor for the 50%, 66 2/3% and 100% JSAs but they are lower than the conversion factors that would be generated by reasonable actuarial assumptions developed during the past decade, resulting in unreasonably low benefits. The factors used to calculate the

75% JSA under the A-B Sub-Part are based on the 1971 Group Annuity Mortality Table ("1971 GAM table") and a 7% interest rate, which also produce unreasonably low conversion factors and JSA benefits. The other sub-parts of the Plan likewise use actuarial assumptions (e.g. the 1984 Unisex Pension ("UP 1984 table")[1]) or fixed factors that generate benefit amounts that are less than the actuarial equivalent of the SLA participants could have taken at retirement, when compared to benefits calculated using reasonable actuarial assumptions. By using unreasonable actuarial assumptions — such as the 1971 GAM table and the UP 1984 table, which were developed over 40 years ago — to calculate conversion factors and JSA benefits, Defendants depress the present value of JSAs, resulting in monthly payments that are materially *lower* than they would be if Defendants used up-to-date, reasonable actuarial assumptions and conversion factors. Defendants use unreasonable conversion factors and outdated mortality assumptions to pay benefits even though Rockwell uses current, updated assumptions in its audited financial statements to calculate the benefits Rockwell expects to pay retirees.

        8.      By using flawed mortality assumptions (as explained further below), Defendants caused Plaintiff and other similarly situated Class members to receive less than they should each month, reducing the present values of their retirement benefits by thousands of dollars.

        9.      Accordingly, Plaintiff brings this action on behalf of himself and the proposed Class, seeking, *inter alia*, payment of benefits improperly withheld, an Order from the Court reforming the Plan to conform to ERISA, recalculation and payment of benefits pursuant to the

---

[1]     The UP 1984 table was published in 1976, and was based on data from 1965-1970. *See* Paul Jackson & William Fellers, The UP 1984 – A "Unisex" Mortality Table For Non-Insured Pension Plans, at 37 Table 10 (Aug. 26, 1976), available at https://www.actuaries.org/IACA/Colloquia/Sydney1976/Vol_1/Jackson_Fellers.pdf (last viewed April 1, 2019).

reformed Plan, as required under ERISA, and such other relief as the Court determines is just and equitable.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

11.     This Court has personal jurisdiction over Defendants because they are headquartered, transact business, or reside in, or have significant contacts with this District, and because ERISA provides for nationwide service of process. Defendant Rockwell is headquartered in this District. Upon information and belief, the Committee and its respective members are also based in this District.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

13.     Plaintiff Mark Berube is a resident of Monroe, Georgia, and a Participant in the Plan. Mr. Berube worked for Rockwell (formerly Allen Bradley) for approximately 15 years before terminating from Rockwell in 2005 at age 50. He began receiving his pension in October of 2019. Mr. Berube is currently receiving a 50% JSA, with his wife as the beneficiary.

5

**Defendants**

14.     Rockwell is a manufacturer of industrial automation and information technology with its headquarters in Milwaukee, Wisconsin. Rockwell sponsors the Plan and is the Plan Administrator.

15.     The Committee has fiduciary responsibility for the administration and operation of the Plan. The Committee is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or control respecting the management of the Plan and authority or control respecting the management or disposition of its assets.

16.     John/Jane Does 1 through 20, inclusive, are the individual members of the Committee responsible for controlling and managing the Plan. Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

17.     ERISA requires that benefits paid to Participants who do not die before beginning to receive benefits be in the form of a "Qualified Joint and Survivor Annuity" ("QJSA"), unless the Participant elects to waive the QJSA and affirmatively selects a different benefit form. 29 U.S.C. § 1055(a)(1) and (c)(1)(A)(i). To waive the QJSA, the Participant's spouse must consent in writing, although no consent is required if the Participant is not married at the time of retirement. 29 U.S.C. § 1055(c)(2). The QJSA is thus the default form of benefit.

18.     The QJSA for a married Participant must pay a survivor benefit worth at least 50 percent, but no more than 100 percent, of the benefit payable during the Participant's lifetime. 29 U.S.C. § 1055(d)(1). The QJSA for an unmarried Participant must be an annuity for the life of the

Participant. 26 C.F.R. § 1.401(a)-20, A-25. ERISA requires that the QJSA under the Plan be actuarially equivalent to the SLA. *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).

19. Pension plans must also offer participants at least one other form of survivor annuities, known as qualified optional survivor annuities ("QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); *see also* 26 U.S.C. § 417(g). A QOSA is similar to a QJSA, except that the QOSA's survivor annuity percentage must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%. ERISA requires that QOSAs be actuarially equivalent to the SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

20. ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA"). *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity for the life of the participant's surviving spouse (*i.e.,* a beneficiary) if the participant dies before reaching the plan's normal retirement age. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA. See ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

21. Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205 concerning alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

22. The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional

form of life annuity offered under the plan."[2] Indeed, the QJSA for married participants "must be as least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16; *see* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) ("All other optional forms of benefit payable to the participant must be compared with the QJSA using a single set of interest and mortality assumptions that are reasonable and that are applied uniformly with respect to all such optional forms payable to the participant . . . ."). The regulations require these requirements regarding QJSAs apply "when the participant attains the earliest retirement age under the plan." 26 C.F.R. § 1.401(a)-20 Q&A 17.

23. ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement. *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires the present value of the lump sum be determined using the applicable mortality table (the "Treasury Mortality Table")[3] and applicable interest rate (the "Treasury Interest Rate")[4] (collectively, the "Treasury Assumptions"), which are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

---

[2]    26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Treasury Regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity. For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities." 26 C.F.R. § 1.401(a)-11(b)(1)(i).

[3]    *See* 26 C.F.R. § 1.430(h)(2)-1.

[4]    *See* 26 C.F.R. § 1.430(h)(3)-1.

*Reasonable Factors Must be Used When Calculating Actuarial Equivalence*

24.    "Two modes of payment are actuarially equivalent when their ***present values are equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[5]

25.    Under ERISA, "present value" must "reflect anticipated events." Such adjustments shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

(a)    The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors,*** for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b)    A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)    The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12 determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

---

[5]    According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent. "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

26.     The Regulations also rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

27.     Like the Regulations and ERISA's definition of "present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board ("ASB")[6] of the American Academy of Actuaries (the "Academy"), require actuaries to use "reasonable assumptions." *See* ASOP No. 27, Para. 3.6 ("each economic assumption used by an actuary should be reasonable"). *See also* ASOP No. 35, Para. 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

28.     Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018). As the court explained in *Dooley v. Am. Airlines, Inc.*, each actuarial assumption used to calculate QJSAs, QOSAs and QPSAs must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity. The term actuarially

---

[6]     The ASB, an independent entity created by the Academy in 1988, serves as the single board promulgating standards of practice for the entire actuarial profession in the United States. The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at \*10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

29.     Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor the participants should be better or worse off if a participant selects a SLA or a JSA.  *See Bird v. Eastman Kodak Co.*, 390 F. Supp. 2d 1117, 1118–19 (M.D. Fla. 2005).   "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment."  Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-C-0505, 2020 WL 620221, \* 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

30.     Section 203(a) of ERISA, 29 U.S.C. § 1053(a), provides that employees with at least 5 years of service have "a nonforfeitable right to 100 percent of [their] accrued benefit…" The Treasury Regulation for the Tax Code corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

## SUBSTANTIVE ALLEGATIONS

## I.     THE PLAN

31.     Rockwell originally established the Plan on October 10, 1945.[7] The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

32.     The Plan has 36 sub-plans, which cover the benefit plans of Rockwell's various businesses that merged into the Plan.[8]  For purposes of calculating actuarial equivalent benefits, these sub-plans are categorized into eight separate parts (the "Sub-Parts"), which can be identified as: (a) Allen Bradley (i.e. the A-B Sub-Part); (b) Reliance Salaried and Motion Control; (c) Cleveland; (d) Reliance General; (e) Reliance Washington; (f) Reliance Dodge; (g) NA Transformer; and (h) ECA Sub-Part. Plaintiff is a participant in the A-B Sub-Part.

33.     For the A-B Sub-Part, the "Normal Form" of benefit for unmarried participants is either an annuity for the life of the participant with a minimum ten-year payout (a " 10YCLA"), if the participant terminates employment after his earliest retirement date, or a SLA, if the participant terminates before his earliest retirement date.[9]  For purposes of Section 205 of ERISA, this normal form of benefit serves as the "QJSA" for unmarried participants.[10] The QJSA for *married* participants is a 50% JSA.  Participants who terminate after their earliest retirement date can choose to receive their pension benefits as a SLA, 10YCLA, 50%, 66 2/3%, 75% or 100% JSA. Participants who terminate before their earliest retirement can choose a SLA, a 50% or a 75% JSA.

---

[7]     *See* Rockwell Automation Pension Plan as Amended and Restated Effective as of January 1, 2013 (hereinafter the "Plan Document") at 1.
[8]     Plan Document at Exhibit 1 "Sub-Plan Index."
[9]     Sub-Plan for Salaried and Hourly Employees of Rockwell Automation, Inc. (Sub-Plan B006) Summary Plan Description (1/1/2011) at 19.
[10]     *Id*.

Plaintiff terminated before his earliest retirement date and began receiving benefits in the form of the Plan's QJSA for married participants — a 50% JSA.

34.     The A-B Sub-Part has three formulas for converting the normal form of benefit to a JSA. The first formula is a table, that varies depending on the age of the participant and spouse at the time of retirement, which is used to convert the normal form of benefit for participants who terminate ***before*** their earliest retirement date to a JSA (i.e. a table to convert the SLA to a JSA); the second also varies depending on the age of the participant and spouse at the time of retirement and is used to convert the normal form of benefit for participants who terminate ***after*** their earliest retirement date to a JSA (i.e. a table to convert the 10YCLA to a JSA). Neither the Plan nor the A-B Sub-Part specifies the actuarial assumptions upon which the first and second tabular factors are based. The third formula is a series of tables for converting the SLA and the 10YCLA to the 75% JSA. The A-B Sub-Part states that these tables are based on the 1971 GAM table and a 7% interest rate.

35.     Most of the remaining Sub-Parts of the Plan that identify the actuarial assumptions used to calculate JSA benefits use antiquated assumptions; the ones that do not list the assumptions used are based on conversion factors that were calculate using unreasonable assumptions.[11]

---

[11]     The Reliance Salaried and Motion Control, Cleveland and Reliance General Sub-Parts use the UP 1984 table and a 6% interest rate; the Reliance Washington Sub-Part uses the UP 1984 table and a 6% interest rate except for conversions of the SLA to the 50% JSA (uses the 1971 GAM table and a 7.75% interest rate); the Reliance Dodge Sub-Part uses the UP 1984 table and a 7% interest rate except for conversions to the 50% JSA (uses a .90 conversion factor adjusted by .5% for each year of age differentiation between the participant and spouse); the NA Transformer Sub-Part uses a conversion factor of .85 for the 50% JSA and .75 for the 100% JSA and uses the UP 1984 table and a 6% interest rate for all other conversions; the ECA Sub-Part uses the 1983 Group Annuity Mortality Table for Males and an interest rate equal to the average yield rates on 20-year U.S. Treasury Bonds for the 36 months immediately preceding the Plan Year for which the present value is to be calculated. *See* Plan Document at Exhibit 4 "Actuarial Equivalence," 1-4.

## II.    The JSA Benefits Under the Plan Are Not Actuarially Equivalent to the SLA Participants Could Have Received.

### A.    Comparing a SLA to Other Forms of Benefits.

36.    All of the Plan's JSAs are either "qualified joint and survivor annuities" ("QJSAs") or "qualified optional survivor annuities" ("QOSAs") under ERISA.  As set forth above, ERISA requires that QJSAs and QOSAs be the "actuarial equivalent" of an SLA.  *See* ERISA §§ 205(d)(1) and (2), 29 U.S.C. § 1055(d)(1) and (2).

37.    As discussed above, two benefits are "actuarially equivalent" when the present values of their benefit streams are equal when calculated using the same, reasonable actuarial assumptions.  To calculate actuarially equivalent benefits, you compare the present value of receiving an annuity for each benefit form (*e.g.,* an SLA and a JSA) that pays the participant $1 annually until the participant's death, taking into account the participant's age (and, where applicable, the age of any contingent beneficiary), using reasonable actuarial assumptions concerning mortality and an interest rate.  The present value for each benefit form is called an "annuity value" and the ratio of the forms' annuity values is called a "conversion factor."  Multiplying one benefit amount by this conversion factor generates an actuarially equivalent benefit in the other form.  The reasonableness of both the mortality and interest rate assumptions is critical to the calculation.

38.    The interest rate used to determine the present value of each future payment is designed to take into account the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

39.    An interest rate assumption used to determine an actuarially equivalent benefit must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29

14

U.S.C. § 1002(27). The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, 29 U.S.C. §§ 1055(g)(3)(B)(iii), 1083(h)(2).

40. A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

41. More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries ("SOA"), an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM") 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014") and 2019 (the "Pri-2012") to account for changes to a population's mortality experience.

42. Since at least the 1980s, the life expectancies in mortality tables have substantially improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this

15

paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

43.     Pursuant to Actuarial Standard of Practice No. 35, para. 3.5.3 of the Actuarial Standards Board,[12] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[13]

44.     Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality. For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[14] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[15]

45.     For purposes of determining whether two benefits are "actuarially equivalent" under ERISA, the mortality assumptions used to calculate present value must be reasonable, which means that the selected mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C. § 1002 (27). The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

---

[12]     Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Schwartzmann & Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[13]     Available at: http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

[14]     Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf

[15]     Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf

46.     If the present value of a SLA and a JSA are equal when those present values are calculated using the same reasonable interest rate and mortality assumptions, the two benefits are actuarially equivalent.

47.     Using an antiquated mortality table to convert an SLA into a JSA will generally result in a lower conversion rate and lower benefit payments compared to the result that would be produced by using a reasonable, up-to-date mortality table.

**B.      The Plan Does Not Use Reasonable Actuarial Assumptions to Calculate the Present Value of JSAs.**

**1.      The A-B Sub-Part's Tabular Factors for 50%, 66 2/3% or 100% JSAs Do Not Provide Actuarial Equivalent Benefits**

48.     The A-B Sub-Part's conversion factors do ***not*** produce QJSAs or QOSAs that are actuarially equivalent to the SLA offered to a participant at the time she retires because the present values of those benefits are lower than the present value of the SLA.

49.     The A-B Sub-Part does not identify the actuarial assumptions upon which the tabular factors used to convert the SLA and 10YCLA to the 50%, 66 2/3% or 100% JSAs are based. Nevertheless, the conversion factors produced by these tabular factors are unreasonably low.

50.     The charts below illustrates the conversion factors and the benefits for a 60-year-old and a 65-year-old participant who earned an SLA of $1,000 per month who retired in 2018 using the A-B Sub-Part's tabular factors and the applicable Treasury Mortality Table for 2018 and the 3.75% discount rate that Rockwell used in its Form 10-k.

**60-Year-Old at Benefit Commencement Date**

| Benefit Form | A-B Sub-Part's Conversion Factors | Monthly Amount Using A-B Sub-Part's Conversion Factors | Conversion Factors Using Updated Assumptions | Monthly Amount Using A-B Sub-Part's Conversion Factors | Monthly Difference | Percent Difference in Benefit Amount |
|---|---|---|---|---|---|---|
| SLA | N/A | $1,000.00 | N/A | $1,000.00 | N/A | N/A |
| 50% JSA | .90 | $905.20 | .93 | $938.93 | $33.73 | 3.73% |
| 66 2/3% JSA | .87 | $877.90 | .92 | $920.20 | $42.30 | 4.82% |
| 100% JSA | .82 | $828.60 | .88 | $884.89 | $56.29 | 6.79% |

**65-Year-Old at Benefit Commencement Date**

| Benefit Form | A-B Sub-Part's Conversion Factors | Monthly Amount Using A-B Sub-Part's Conversion Factors | Conversion Factors Using Updated Assumptions | Monthly Amount Using A-B Sub-Part's Conversion Factors | Monthly Difference | Percent Difference in Benefit Amount |
|---|---|---|---|---|---|---|
| SLA | N/A | $1,000.00 | N/A | $1,000.00 | N/A | N/A |
| 50% JSA | .88 | $884.10 | .92 | $925.68 | $41.58 | 4.70% |
| 66 2/3% JSA | .85 | $851.90 | .90 | $903.30 | $51.40 | 6.03% |
| 100% JSA | .79 | $795.20 | .86 | $861.64 | $66.44 | 8.36% |

51.     Defendants application of these conversion factors based on unreasonable actuarial assumptions to calculate benefits for participants receiving 50%, 66 2/3% and 100% JSAs under the A-B Sub-Part results in benefits that are not actuarially equivalent to the participant's SLA and lower monthly payments than the participant should be receiving.

52.     As demonstrated above, the conversion factors Defendants use for the A-B Sub-Part are **substantially lower** (i.e. worse for participants) than conversion factors generated using the updated mortality table and interest rate from Rockwell's Form 10-k.

53.     While the amount of the loss suffered will vary depending on the ages of the participant and beneficiary at the time of retirement, all participants receiving JSAs under the A-B Sub-Part are not receiving an actuarially equivalent form of benefit because the present values are not equal to that of the SLA they could have taken at the time they retired.

54.     Plaintiff terminated from Rockwell at age 50, before his earliest retirement date, and began receiving benefits when he was 64 years and 10 months old.  If he had chosen to receive an SLA when he retired, it would have paid him $1,241.68 per month.  The 50% JSA he receives pays $1,091.44 a month.  If the 2018 Treasury Assumptions were applied, Plaintiff's benefit would be $1,144.11, or $52.67 more per month than the benefit produced by using the A-B Sub-Part's tabular factors.  By using these tabular factors — based on unreasonable, outdated actuarial assumptions — instead of the applicable Treasury Assumptions, Defendants reduced the present value Plaintiff's benefits at the time of his retirement by approximately $9,364.58.

55.     Because Plaintiff's benefits were calculated using tabular factors based on unreasonable actuarial assumptions, Plaintiff has been harmed because he is receiving less each month than he would have received if the Plan and Sub-Parts used current, reasonable actuarial assumptions. Plaintiff, along with other participants and beneficiaries of the Plan, has been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

2. **The Actuarial Assumptions Used to Calculate the 75% JSA Under the A-B Sub-Part and Those Used to Calculate Benefits Under the Remaining Sub-Parts Do Not Provide Actuarial Equivalent Benefits.**

56.     Participants of the A-B Sub-Part that choose the 75% JSA and participants in the remaining Sub-Parts that receive JSAs do ***not*** receive benefits that are actuarially equivalent to the SLA they could have received when they retired.

57.     The tabular factors in the A-B Sub-Part for calculating the 75% JSA are based on the 1971 GAM table and a 7% interest rate. The same actuarial factors are used to calculate the value of an SLA for unmarried participants whose normal form of benefit is a 10YCLA.  The remaining Sub-Parts use similarly unreasonable actuarial assumptions to calculate JSA benefits. Most use the UP 1984 table with a 6% interest rate or fixed, unreasonable conversion factors (e.g. Reliance Dodge Sub-Part: .90 for 50% JSA; NA Transformer: .85 for 50% JSA and .75% for 100% JSA).

58.     Using the 1971 GAM or UP 1984 mortality tables as the basis for conversion factors results in QJSAs and QOSAs that are lower than the actuarial equivalent of the SLA participants could select instead, because both mortality tables are severely outdated compared to contemporary mortality tables and do not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).

59.     The 1971 GAM table and the UP 1984 table are more than 40 years old and do not incorporate improvements in life expectancy that have occurred since they were published. According to the Centers for Disease Control and Prevention, in 1970, a 65-year-old had an average life expectancy of 15.2 years (16.8 years in 1984).[16]  In 2010, a 65-year-old had a 19.1-

---

[16]     *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf

year life expectancy, a 26% increase (13% increase from 1984 to 2010). Accordingly, by 2010, the average employee would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer amount of time than in 1971 and 1984.

60.     Using these outdated mortality tables decreases the values of JSAs relative to the SLA, thereby materially reducing the monthly benefits that participants and beneficiaries receive in comparison to the monthly benefits participants and beneficiaries would receive if the remaining Sub-Parts used updated, reasonable mortality assumptions.  Participants who receive a JSA under the remaining Sub-Parts do not receive actuarially equivalent benefits.

61.     Defendants knew or should have known that the 1971 GAM and UP 1984 tables were outdated and that it was unreasonable to use them because they resulted in lower monthly benefits for participants and beneficiaries receiving a JSA.

62.     Rockwell uses up-to-date actuarial assumptions when calculating pension costs in its audited financial statements that it prepared with the assistance of an independent auditor throughout the Class Period.  Under Generally Accepted Accounting Principles ("GAAP"), mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[17]  In its Annual Report for the year ending September 30, 2015, Rockwell

---

[17]     As noted in a "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement

represented that it measured its liabilities under the Plan using the RP-2014, with the MP-2014

improvement scale, not the 1971 GAM or UP 1984 that it used to pay participants. Rockwell's

10-k filed on November 15, 2015 states:[18]

> In October 2014, the U.S. Society of Actuaries released a new mortality table (RP-2014) and new mortality improvement scale (MP-2014). *We used these mortality tables to measure our U.S. pension obligation as of September 30, 2015.* This change in mortality assumptions resulted in a $222.1 million increase to our projected benefit obligation. (Emphasis added).

63.    Rockwell has known since at least 2006 that its use of the 1971 GAM and the UP

1984 were out-of-date. Rockwell's Annual Report for the period ending September 30, 2006

states:

> Additionally, in establishing our 2006 pension assumptions, we performed an actuarial experience study that changed other assumptions including retirement rate, employee turnover rate, and *mortality rate as a result of utilizing the RP2000 table projected forward 10 years.[19]*

scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aers-fra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits-103015.pdf

[18]    *See* Rockwell's 10-k for year ending September 30, 2015 at 64, available at: http://d1lge852tjjqow.cloudfront.net/CIK-0001024478/bda22102-db37-4637-b863-f90e77122e08.pdf

[19]    *See* Rockwell's 10-k for year ending September 30, 2006 at 29; available at http://d1lge852tjjqow.cloudfront.net/CIK-0001024478/5a1cd6ad-b128-4d4d-80a8-036dd82a3eec.pdf

64.     Rockwell used updated mortality tables in its financial statements throughout the Class Period.  In its audited financial statements, Rockwell used reasonable actuarial assumptions to report a greater liability for the benefits the Plan paid out to participants receiving JSAs calculated using the antiquated and unreasonable 1971 GAM and UP 1984 tables.  There is no reasonable justification for Defendants to use old mortality tables that presume an early death and an early end to benefit payments in order to calculate unfairly low annual benefits for participants, while at the same time using an up-to-date, reasonable mortality table to project a longer duration of these very same annual benefit payments for annual financial reporting.

65.     Since these two analyses measure the length of the very same lives and the very same benefit streams, they should use the same mortality assumptions. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, '[i]f plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).   Although Defendants commonly used reasonable mortality tables in calculating actuarial present values, Defendants knowingly and wrongfully use the 1971 GAM and UP 1984 tables, which are several decades out-of-date, to calculate retirees' JSA benefits.

66.     Rockwell updates the mortality assumptions used in its financial statements filed with the SEC to predict for its shareholders the potential costs associated with the Plan based on the SOA's publications and the "experience studies" that it conducts the measure life expectancies. For Plan participants, however, Rockwell converts participants' Normal Form of benefit to other

forms of benefits using old, outdated mortality assumptions, ignoring the SOA, in order to reduce the amount it pays retirees.

67. Defendants misrepresented to participants that the JSA benefits offered under the Plan are actuarially equivalent to the SLA those participants could have received to reduce the amount of benefits they paid participants.

68. During the relevant period, Rockwell's use of the 1971 GAM, UP 1984 tables or unreasonably low fixed factors to calculate JSAs was unreasonable.

69. Had the Plan used reasonable actuarial assumptions, such as the Treasury Assumptions, Plaintiff and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

70. The chart below compares the amount that a Plan participant who is 65-years old (with a 65-year-old spouse) who accrued an SLA of $1,000/month would receive per month if she elected to receive her benefits in the form of a 50% JSA, using the 2018 Treasury Assumptions and some of the Plan's actuarial assumptions:

|  | UP-1984/6% | 2018 Treasury Assumptions | Percent Difference in Benefit Amount |
|---|---|---|---|
| SLA | $1,000 | $1,000 | N/A |
| 50% JSA | $900.07 | $926.67 | 3.0% |

71. The differences in benefit amount between the 2018 Treasury Assumptions and the assumptions that Rockwell uses will vary depending on the Sub-Part and the ages of the participant and the beneficiary, participants and beneficiaries who receive JSAs under the Plan are not receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA that could have received.

72. Discovery will likely show that Defendants use of unreasonable actuarial assumptions deprived retirees and their spouses of millions of dollars.

73. Because the Plan used grossly outdated, unreasonable mortality tables throughout the relevant time period, the benefits paid to participants and beneficiaries who receive QJSAs, QOSAs are *not* actuarially equivalent to what they would have received if they had selected an SLA, in violation of ERISA § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A). Rather, the benefits payable under these forms of benefit are much lower than they should be.

## CLASS ACTION ALLEGATIONS

74. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants and beneficiaries of the Plan who are receiving the QJSA (except for those unmarried participants whose QJSA under the Plan is an SLA), a QOSA or a QPSA. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plan.

75. The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of persons.

76. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

77. There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

A.      Whether the Plan and Sub-Parts provide QJSAs, QOSAs and QPSAs that are, in fact, actuarially equivalent to those that would be paid under an SLA;

B.      Whether the Plan should be reformed to comply with ERISA; and

C.      Whether Plaintiff and Class members should receive additional benefits based on the difference between the benefits they are receiving and the benefits they would be receiving if, on their benefit commencement date, their benefit had been actuarially equivalent to the SLA they could have taken.

78.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

79.     This action may be properly certified under either subsection of Rule 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

80.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

81.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

82.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

83.     The Plan and all the Sub-Parts improperly reduce annuity benefits for participants and beneficiaries who receive JSAs below what they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires.

84.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

85.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating QJSAs, QOSAs and QPSAs violate ERISA because they do not provide a benefit that is actuarially equivalent to an SLA. By not providing an actuarially equivalent benefit, Defendants have violated Section 205 of ERISA, 29 U.S.C. § 1055.

Case 2:20-cv-01783-LA   Filed 12/02/20   Page 27 of 33   Document 1

86. Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a) re-calculation, correction, and payment of benefits previously paid for JSAs under the Plan and all Sub-Parts;

(b) an "accounting" of all prior benefits and payments;

(c) a surcharge;

(d) disgorgement of amounts wrongfully withheld;

(e) disgorgement of profits earned on amounts wrongfully withheld;

(f) a constructive trust;

(g) an equitable lien;

(h) an injunction against further violations; and

(i) other relief the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan**
**(ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

87. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

88. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

89. The Plan and the Sub-Parts improperly reduce annuity benefits for participants and beneficiaries who receive QJSAs, QOSAs and QPSAs below what they would receive if those

benefits were actuarially equivalent to an SLA as ERISA requires. By not providing an actuarially equivalent benefit, Defendants have violated Section 205 of ERISA, 29 U.S.C. § 1055.

90.     Plaintiff is entitled to reformation of the Plan to require Defendants to provide actuarially equivalent benefits.

91.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

92.     Plaintiff is entitled to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits under the Plan following reformation.

### THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

93.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

94.     As one of the Plan's administrators, the Committee is a fiduciary of the Plan.

95.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or

discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

96. The Committee and its members are fiduciaries for the Plan because they exercised discretionary authority and control over management of the Plan as well as authority and control over the disposition of Plan assets. In particular, they had authority or control over the amount and payment of benefits paid as JSAs, which were paid from Plan assets.

97. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plan is consistent with ERISA.

98. The Plan is not consistent with ERISA because it calculates QJSA, QOSA and QPSA benefits that are less than the actuarial equivalent of an SLA, resulting in participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA.

99. In following the Plan, which did not conform with ERISA, the Committee and its members exercised their fiduciary duties and control over Plan assets in breach of their fiduciary duties.

100. ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Committee to pay benefits that were not actuarially equivalent, in violation of ERISA, Rockwell breached its fiduciary duties to supervise and monitor the Committee.

101. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

102.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plan and Sub-Parts' established methodologies for calculating actuarial equivalence of JSAs violate ERISA because they do not provide an actuarially equivalent benefit.

103.    Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)    re-calculation, correction and payment of QJSA, QOSA and QPSA benefits previously paid under the Plan and Sub-Parts;

(b)    an "accounting" of all prior benefits and payments;

(c)    a surcharge;

(d)    disgorgement of amounts wrongfully withheld;

(e)    disgorgement of profits earned on amounts wrongfully withheld;

(f)    a constructive trust;

(g)    an equitable lien;

(h)    an injunction against further violations; and

(i)    other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    Certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that the Plan fails to properly calculate and pay JSA benefits that are actuarially equivalent to the SLA participants could have received, in violation of ERISA § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A);

C.      Ordering Defendants to bring the Plan and Sub-Parts into compliance with ERISA, including, but not limited to, reforming the Plan and the Sub-Parts to bring them into compliance with ERISA with respect to calculation of actuarially equivalent JSAs and QPSAs;

D.      Ordering Defendants to correct and recalculate benefits that have been paid;

E.      Ordering Defendants to provide an "accounting" of all prior payments of benefits under the Plan to determine the proper amounts that should have been paid;

F.      Ordering Defendants to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.      Ordering Defendants to disgorge any profits earned on amounts improperly withheld;

H.      Imposition of a constructive trust;

I.      Imposition of an equitable lien;

J.      Reformation of the Plan;

K.      Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.      Ordering Defendants to pay future benefits in accordance with the terms of the Plan, as reformed;

M.      Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.     Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.     Any other relief the Court determines is just and proper.

Dated: December 2, 2019                    Respectfully submitted,

                                            */s/ Charles J. Crueger*
                                           **CRUEGER DICKINSON LLC**
                                           Charles J. Crueger
                                           Erin K. Dickinson
                                           4532 North Oakland Avenue
                                           Whitefish Bay, WI
                                           Tel: (414) 210-3868
                                           Email: cjc@cruegerdickinson.com
                                           Email: ekd@crugerdickinson.com

                                           **IZARD, KINDALL & RAABE LLP**
                                           Robert A. Izard
                                           Mark P. Kindall
                                           Douglas P. Needham
                                           Oren Faircloth
                                           29 South Main Street, Suite 305
                                           West Hartford, CT 06107
                                           Tel: (860) 493-6292
                                           Fax: (860) 493-6290
                                           Email:  rizard@ikrlaw.com
                                           Email:  mkindall@ikrlaw.com
                                           Email:  dneedham@ikrlaw.com
                                           Email:  ofaircloth@ikrlaw.com

                                           Gregory Y. Porter
                                           Mark G. Boyko
                                           **BAILEY & GLASSER LLP**
                                           1054 31st Street, NW, Suite 230
                                           Washington, DC 20007
                                           (202) 463-2101
                                           (202) 463-2103 fax
                                           gporter@baileyglasser.com
                                           mboyko@baileyglasser.com

                                           ***Counsel for Plaintiffs***