UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Mark Berube, on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br><br>       vs.<br><br>Rockwell Automation, Inc., the Rockwell Automation Employee Benefits Plan Committee, and John/Jane Does 1–20,<br><br>              Defendants. | Civil Action No. 2:20-CV-01783<br><br><br><br><br><br><br>CLASS ACTION |

**DECLARATION OF ROBERT A. IZARD IN SUPPORT OF PLAINTIFF'S MOTIONS FOR FINAL APPROVAL OF CLASS SETTLEMENT, AND FOR AN AWARD OF ATTORNEYS FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF A CASE CONTRIBUTION AWARD**

I, Robert A. Izard, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a partner with the law firm of Izard, Kindall & Raabe ("IKR"), co-counsel for the Plaintiff, Mark Berube ("Plaintiff" or "Berube"). I make this Declaration in support of Plaintiff's Motions for Final Approval of Class Settlement and for an Award of Attorneys' Fees, Reimbursement of Expenses, and Award of a Case Contribution Award. A true and accurate copy of the proposed Settlement Agreement, and the exhibits thereto, is attached as Exhibit A to this Declaration.

2. I have been actively involved in the prosecution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based on my active supervision and participation in all material aspects of the Action and if called to do so, I could and would testify competently thereto.

## I. Summary of Plaintiff's Claims

3. Plaintiff filed this proposed class action on December 2, 2020, on behalf of participants and beneficiaries receiving pension benefits in the form of a joint and survivor annuity ("JSA") from the B0001 and B006 Sub-Plans of the Rockwell Automation Pension Plan (the "Plan") who began receiving benefits during the Class Period. Plaintiff contends that Rockwell underpaid retirees and beneficiaries whose normal form of benefit for an unmarried participant was a single life annuity ("SLA") and who are receiving JSAs, and that these retiree and beneficiary monthly pension checks should be higher. *See* Dkt. 1, generally.

4. As Plaintiff alleged in the Complaint, ERISA requires that JSAs be at least the "actuarially equivalent" of the SLA the participant could have taken when he or she began to receive benefits. *Id*. at ¶¶ 17–23 (citing ERISA § 205(d) and (e), 29 U.S.C. § 1055(d) and (e)). Two benefit forms are "actuarially equivalent" when they have the same present value, calculated using the same, reasonable actuarial assumptions. Dkt. 1 at ¶¶ 24-30.

5. The actuarial assumptions used to calculate present values for determining actuarial equivalence involve mortality and interest rates. A mortality assumption estimates how many benefit payments will be made, based on the ages of the participant and (in the case of JSAs), the beneficiary. An interest rate assumption discounts the value of expected future payments to a present value. When payments under one benefit option are likely to extend longer than those under another, the benefit amount under the first option will be lower to account for the likelihood that more payments will be made. For example, the amount of a JSA benefit will be lower than the amount of an SLA benefit to account for the possibility that the beneficiary will receive benefits after the participant's death. But, the present values of those two forms of benefits must be the same to be actuarially equivalent.

6. Plaintiff alleged in the Complaint that Rockwell calculated his JSA benefit (and the JSAs of other Class Members) using outdated mortality and interest rate assumptions which caused his monthly benefit to be less than an "actuarially equivalent" amount. Dkt. 1, ¶¶ 68-73. In other words, the present values of Class Members' JSA benefits were less than the present values of the SLAs they could have taken. The present values of the two benefit types would have been equal had Defendants used mortality and interest rate assumptions that were reasonable as of the date Class Members began to receive their benefits.

## II. Summary of the Litigation

7. On December 2, 2020, Plaintiff filed the class action Complaint. Dkt. 1. On February 1, 2021, Defendants moved to dismiss (Dkt. 15), which this Court denied on April 13, 2021. Dkt. 22. Defendants filed an Answer and Affirmative Defenses on April 26, 2021. Dkt. 23.

8. On June 1, 2021, Defendants moved for Summary Judgment. Dkt. 25. The Court denied the Motion on January 26, 2022. Dkt. 50.

9. Following a Scheduling Conference, on June 14, 2021, the Court entered a scheduling order (the "Scheduling Order") pursuant to Fed. R. Civ. P. 26(f). Dkt. 24.

10. In September 2021, the Parties filed a joint motion to stay to explore the possibility of settlement. Dkt. 38. The Court granted the Parties' motion and ordered the Parties to file a joint status report no later than November 30, 2021, advising the Court of how the Parties intended to proceed in this matter. Dkt. 39. The Court granted the Parties' motion and ordered the Parties to file a joint status report no later than November 30, 2021, advising the Court of how the Parties intended to proceed in this matter. Dkt. 39.

11. On November 16, 2021, the Parties participated in a mediation with Robert Meyer, Esq. (JAMS) but were unable to reach a settlement. *See* Dkt. 40. In accordance with the Court's

Order (Dkt. 39), on November 30, 2021, the Parties updated the Court on the status of the mediation and submitted a proposed revised discovery plan. Dkts. 40, 40-1.

12. In December 2021, the Court adopted the Parties' proposed revised discovery plan. Dkt. 41, ("Second Scheduling Order".) In accordance with the Initial and Second Scheduling Orders, the Parties engaged in fact discovery, including exchanging initial disclosures, interrogatories, and requests for production of documents, and producing a substantial number of documents and substantial amounts of data that would permit the calculation of Class damages.

13. In April 2022, Plaintiff filed a motion to modify the Second Scheduling Order to allow the Parties to complete expert discovery. Dkt. 51. The Court granted Plaintiff's motion and entered a Revised Discovery Plan. Dkt. 52, ("Third Scheduling Order".) The Third Scheduling Order reset the Parties' expert disclosure deadlines, Plaintiff's class certification deadline, and the Parties' dispositive motion deadline. In accordance with the Third Scheduling Order, the Parties completed expert discovery, including exchanging expert reports by their respective actuarial experts, and each Party deposed the other's actuarial expert.

14. In September 2022, Plaintiff filed a motion for class certification. Dkt. 53. Defendants opposed Plaintiff's motion, (Dkt. 56), and the Court denied Plaintiff's motion. Dkt. 63. Consequently, under the Third Scheduling Order, the Parties' dispositive motions were due May 3, 2023. *See,* Dkt. 52.

15. In April 2023, the Parties' requested a 90-day stay of the dispositive motion deadline to again explore the possibility of settlement with the assistance of Mr. Meyer. Dkt. 64. The Court granted the Parties' motion and ordered the Parties to file a status report no later than July 14, 2023, advising the Court of how they intended to proceed in this matter. Dkt. 65. Thereafter, the Parties continued to discuss the possibility of settlement with the assistance of Mr.

Meyer but were unable to reach an agreement before the July 14, 2023 status report deadline. On July 14, 2023, the Parties filed a Joint Status Report (Dkt. 66) and requested a renewed dispositive motion schedule.

16. On September 1, 2023, Plaintiff filed a motion for reconsideration of the Court's order denying Plaintiff's motion for class certification, or in the alternative, a renewed motion for class certification of an amended class. Dkt. 68. Throughout this time, the Parties continued to discuss the possibility of settlement with the assistance of Mr. Meyer. On September 11, 2023, the Parties reached a settlement in principle to resolve Mr. Berube's claims, and those of the Plan participants in the "SLA Group", and resolve other key issues related to the structure of this Settlement Agreement.

17. The Parties fully executed the Settlement Agreement on November 1, 2023, and on the same day, Plaintiff filed his Unopposed Motion for Preliminary Approval of Class Settlement. ECF 72–75. The Court granted the motion on November 7, 2023. ECF 76.

### III. Analysis of Key Settlement Terms

18. ***Total Benefit to the Class:*** If Plaintiff had prevailed at trial on both liability and damages, the "make whole" relief would have been the difference in value of JSAs calculated during the Class Period with the Plans' assumptions compared to the Assumptions opined by David Pitts, Plaintiffs' expert (the "Pitts Assumptions"). *See* Expert Report and Expert Rebuttal Report of David Pitts. Dkts. 55-5 and 55-6. Mr. Pitts opined that those damages for the 202 Class members as of May, 2022 were $1.44 million. The value of the proposed Settlement, with a present value of approximately $900,000, is approximately 60% of this maximum damage amount.[1]

---

[1] The precise damages numbers change constantly as benefits continue to be paid, Class Members die and stop receiving benefits and participants retire and join the Class.

5

19. The material terms of the Agreement are summarized below:

*The Class*: The Class definition is: All married participants (and their beneficiaries) of the Plan's B001 and B006 Sub-Plans whose normal form of benefits for unmarried participants was an SLA and who elected a JSA commencing on or after December 2, 2014, and before the Preliminary Approval Date and who accrued benefits in the form of a single life annuity. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plan.

20. *Plan Amendment.* Within sixty (60) days after Final Approval, the Plan shall be amended (the "Settlement Amendment") to provide that, effective for payments on or after January 1, 2024, each Class Member is entitled to an increased monthly amount of a benefit, in the form of benefit in effect as of December 31, 2023, which will allocate the Net Settlement Amount among Class Members and/or their Associated Beneficiaries in proportion to the total value of their past and future pension benefit payments.

21. *Calculation of Monthly Benefit Increases:* Except for Deceased Class Members, discussed below, each Class Member shall receive an increase in his or her monthly benefits determined in accordance with the following steps:

(1) calculate the total amount of benefits paid to each Class Member and/or his or her Associated Participant, including interest at 5.27% annually from the date each benefit was paid, from the beginning of the Class Period until January 1, 2024 (the "Past Benefit Amount");

(2) calculate the value of the Past Benefit Amount if paid as a monthly benefit in the same form (*e.g.*, a 50 or 75% JSA) as the Class Member is currently receiving using the Annuitization Assumptions (the "Adjusted Past Benefit");

(3) The Monthly Benefit Increase is the Settlement Percentage multiplied by the sum of (a) the Adjusted Past Benefit and (b) the Currently Monthly Benefit. The Settlement Percentage is calculated by dividing the Net Settlement Amount by the sum of (i) the Past

Benefit Amounts of all Deceased Class Members, (ii) the present value as of January 1, 2024, of the Adjusted Past Benefits for all Class Members and/or Associated Participants (other than Deceased Class Members), and (iii) the present value of all future benefit payments owed to Class Members (before the increase contemplated by this Agreement) as of January 1, 2024 (with (ii) and (iii) calculated using the Settlement Assumptions). [2]

22. ***Timing of Benefit Increase.*** The Settlement Amendment shall provide that any increase in benefits on account of the Settlement Amendment shall begin to be paid no later than the first day of the first calendar month that is at least one hundred and twenty (120) days after Final Approval (the "Benefit Increase Payment Date"), and shall include a lump sum equal to the sum of such increases in monthly payments due from January 1, 2024, until the Benefit Increase Payment Date (provided that no interest is required for such period).

23. ***QDROs.*** Notwithstanding the foregoing, the amount actually payable to a Class Member following approval of the settlement is subject to the terms of any Qualified Domestic Relations Order ("QDRO") with respect to division of benefits between the Participant and the QDRO's alternate payee.

24. ***Calculation of Benefits Upon the Death of a Participant Class Member.*** Upon the death of a Participant Class Member, the amount of the survivor annuity payable to the Participant Class Members' beneficiary, if any, shall be determined using the Class Members' Recalculated Benefit Amount in a manner consistent with the terms of the Plan. Upon the completion and return

---

[2] This allocation methodology is considerably simpler than one that is based on the specific damages which might be determined for each Class Member if Plaintiff prevailed at trial. The primary virtue of this method, from Plaintiff's perspective, is that expert expenses for calculating and verifying a plan of allocation specifically tied to the use of different actuarial assumptions are high relative to the present value of claims in this case. Thus, greater precision in the allocation of the Settlement could only be achieved by further reducing the total value of the Settlement that would be available for distribution to the Class.

of an Estate Claim Form ("Estate Claim Form"), the Plan shall pay the estate of a Deceased Class Member (the participant or beneficiary, whichever is most recently deceased) a lump sum amount equal to the Class Member's Past Benefit Amount multiplied by the Settlement Percentage. The Claim form must be returned to Defendants by no later than six months from the date of Final Approval.

25. ***Equitable Treatment of Class Members:*** The methodology for calculating each Class Member's benefit flows directly and necessarily from the claims alleged in the Complaint. Each Class Member's JSA benefit is compared to the benefit that would have resulted from using the Pitts Assumptions. If the actual benefit is less than Pitts opined it should have been, the Class Member will receive an increase in his or her monthly benefit payments. That increase will take into account both past annuity payments and annuity payments to be made in the future. Each Class Member will receive exactly the same percentage of the difference in the total value of their pension benefit compared to the value of the benefit they would have received using the Pitts Assumptions. Class Members who are already receiving a monthly benefit that exceeds the actuarial equivalent of the SLA they could have selected will not receive increased benefits under the Settlement because they have no calculable loss; however, no Class Member's current benefit amounts will be reduced. The Settlement is thus structured to ensure that every Class Member is treated equitably, receiving a benefit increase that reflects their damages under the theory of the case.

26. ***Release:*** Upon entry of the Judgment by the Court, Plaintiff and each Settlement Class Member shall be deemed to forever release and discharge the Released Parties from any and all Claims arising on or before the Preliminary Approval Date that were brought, or could have been brought, arising out of, or relating to, the provisions of the Plan applicable in the calculation

of the Class Member's benefit. For the avoidance of doubt, a Claim arises on or before the Preliminary Approval Date if a Class Member's benefit amount is determined as of the Preliminary Approval Date or earlier, even as to monthly payments made after the Preliminary Approval Date. "Released Claims" do not include claims by Class Members (other than Plaintiff) that are not or could not be related to the determination of Plan benefits or claims concerning the calculation of individual benefits including, for example, calculation errors.

27. ***Attorneys' Fees, Expenses and Case Contribution Award:*** As noted above, the Parties first negotiated the terms of the Class-wide benefits that would be provided under the Settlement. These negotiations created a definitely determinable benefit increase amount, the present value of which is approximately $900,000. Under the Settlement, Plaintiff will ask the Court to make an award of attorneys' fees and expenses, together with a case contribution award for Mr. Berube. As in any common fund case, these awards would be paid by the Class by reducing each Class Member's calculated benefit by a percentage that is equal to the award's percentage of the total Settlement's present value.

28. The Settlement caps the total amount that Plaintiff may request for attorneys' fees at 1/3 of the present value of the settlement amount minus the Case Contribution Award. In addition, Plaintiffs may seek reimbursement of expenses. Importantly, while Plaintiff cannot request more than this amount, Defendants' may object to Plaintiff's request. There is no "clear sailing" provision. Moreover, the Settlement is not conditioned upon the Court awarding a particular amount for fees, expenses or a Case Contribution Award.

**IV.     Evaluation of the Reasonableness of the Settlement**

29. IKR has substantial experience in class actions, complex litigation and ERISA litigation. A copy of the firm's resume is attached to this Declaration as Exhibit B. Over the

course of the past several years, IKR and Bailey & Glasser LLP ("B&G") have served as counsel for Plaintiffs in several cases involving ERISA's actuarial equivalence requirements. Published decisions in these cases include *Matsen v. Metropolitan Life Insurance Company,* 543 F. Supp. 3d 25 (S.D.N.Y. 2021)(motion to dismiss); *Herndon v. Huntington Ingalls Indust. Inc.,* No. 19-52, 2020 WL 5809965, at *1 (E.D. Va. Aug. 28, 2020) (cross-motions for summary judgment), *report and recommendation adopted sub nom. Herndon v. Huntington Ingalls Indus., Inc.,* No. 19-52, 2020 WL 5809996 (E.D. Va. Sept. 29, 2020); *Belknap v. Partners Healthcare Sys., Inc.,* No. 19-11437-FDS, 2020 WL 4506162 (D. Mass. Aug. 5, 2020) (motion to dismiss); *Smith v. Rockwell Automation, Inc.,* 438 F. Supp. 3d 912 (E.D. Wis. 2020) (same); *Duffy v. Anheuser-Busch Companies, LLC,* 449 F. Supp. 3d 882 (E.D. Mo. 2020) (same); *Smith v. U.S. Bancorp,* No. 18-3405, 2019 WL 2644204, at *1 (D. Minn. June 27, 2019) (same); *Torres v. Am. Airlines, Inc.,* 416 F. Supp. 3d 640 (N.D. Tex. 2019) (same).

30. Based on our experience, knowledge of evolving caselaw and substantial investigation of the facts at issue in this case, IKR strongly supports the proposed Settlement. Several factors are particularly important to this analysis.

31. Both liability and damages turned on the Parties' experts' dueling views of "reasonable" actuarial assumptions. Defendants' expert, Mr. Terry, provided an expert report and testimony suggesting that the JSA benefits received by Plaintiff and, by extension, other Class Members, met ERISA's actuarial equivalence requirements. Dkt. 57-1. If the Court had credited Terry entirely, Plaintiff's case would have failed altogether. If the Court had credited Terry even *in part,* damages to the Class might have been dramatically lower. For example, even if the Court only credited Terry's proposed discount rate assumption, that would have substantially lowered the amount of damages. Plaintiff believes that Terry's analysis is incorrect and that it would not

prevail at trial. However, cases that turn on the testimony of battling experts in arcane fields present significant risks for both parties.

32. No court has definitively ruled on whether plans that used outdated actuarial factors might violate ERISA's actuarial equivalence requirements. No similar case has gone to trial, nor has any appellate court weighed in on the soundness of the legal theory at the heart of the case. Defendants have made numerous legal arguments that, if credited, would result in a judgment in their favor. While Plaintiff believes that Defendants' legal arguments are without merit, there is no question that this area of law is evolving and that Defendants' arguments create a risk that Plaintiff might recover less than a full recovery, or nothing at all.

## V. Evaluation of the Reasonableness of the Attorneys' Fee Request

33. Plaintiff has requested an award of $268,500 in attorneys' fees, which is approximately 30% of the present value of the settlement minus the Case Contribution Award. As noted above, the Settlement provides that this amount will be paid by the Defendant in the first instance, but, like payments for litigation expenses and the Case Contribution Award (discussed below), the percentage of the Settlement awarded in attorneys' fees will be applied as a reduction to Class Members' future benefits. In this way, the Class that benefits from the Settlement will share equally in paying for the legal services that generated that benefit, just as in any other common fund case.

34. This case is factually, technically and legally complex, requiring counsel to master then intricacies of obscure provisions of ERISA, the Pension Protection Act, the Tax Code and implementing regulations, as well as the complexities of actuarial valuations and benefit calculations. It could only be litigated by firms with a high degree of competence in ERISA law, complex litigation and class actions. The attorneys at IKR and B&G are well-qualified. Indeed,

they are almost the only firms involved in litigating the question of whether retirement plans that have failed to update their actuarial assumptions and conversion factors are providing actuarially equivalent benefits to plan participants.

35. Litigating the case on a pure contingency required counsel to shoulder an unusually high degree of risk. The theory of the case was novel and untested, and proving both liability and damages required sophisticated expert testimony. If the case been litigated to trial, counsel would have had to pay far greater amounts out of pocket, with no assurance of recovering those expenses, not to mention the investment of countless hours of attorney time.

**VI. Information Concerning Counsel's Lodestar and Expenses**

36. In preparation for filing this motion, I reviewed IKR's time and out-of-pocket expenses in connection with the current litigation.

37. The information in this declaration regarding my firm's time and expenses is taken from contemporaneous time and expense printouts prepared and maintained by my firm in the ordinary course of business. The time reflected in my firm's lodestar calculation and the expenses for which payment is sought are reasonable and were necessary for the effective and efficient prosecution and resolution of the litigation. In addition, the expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace. IKR prosecuted this case on a wholly contingent basis and has not received any compensation to date for either its litigation expenses or its time.

38. A summary of IKR's hours and lodestar in the case as of October 26, 2023, is shown in the following table:

| Attorney | Years of Practice | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Robert A. Izard | 40 | $ 925 | 174.25 | $ 161,181.25 |
| Mark P. Kindall | 34 | $ 850 | 143.00 | $ 121,550.00 |
| Douglas P. Needham | 15 | $ 650 | 642.25 | $ 417,462.50 |
| Christopher M. Barrett | 13 | $ 550 | 17.25 | $ 9,487.50 |
| Oren Faircloth | 5 | $ 350 | 822.25 | $ 287,787.50 |
| Jude Reid | Paralegal | $ 180 | 37.25 | $ 13,410.00 |
| **Total** | | | **1,836.25** | **$ 1,010,878.75** |

39. Biographical details for the IKR attorneys who worked on the case are included at the end of the Firm's resume, attached as Exhibit B to this declaration.

40. The hourly rates shown in the chart are IKR's normal rates for both hourly customers and class action work (although certain hourly clients can receive a discount for prompt payment). IKR's class action work is a specialized national practice; we do not charge differential rates based on the location where a lawsuit is filed. Courts have approved IKR's fees in class actions litigated all over the country.

41. In the course of our nationwide practice, attorneys at IKR have worked with many of the firms that typically represent plaintiffs in ERISA class actions nationwide. As a result, we are familiar with the rates charged by other firms in our practice area. In our experience, our rates are broadly in line with rates of other firms with nationwide ERISA class action practices, and have been the basis for awards of fees in courts around the country.

42. Firms that litigate high-stakes class action cases against major international corporations such as Rockwell can only succeed with lawyers who are able to match the

experience, talent and resources of the largest, most respected law firms in the country. The firm representing Defendants in this action –Alston & Bird– is a major national firm.

43. IKR and B&G have also incurred $226,891.70 in out-of-pocket expenses while prosecuting this case. B&G's expenses, which total $77,585.34 to date, are detailed in paragraph 3 of the accompanying declaration of Gregory Porter. To date, IKR's out-of-pocket expenses for this litigation are $149,306.36, as summarized by category in the table below.

| Category | Amount |
| --- | --- |
| Court Costs | $ 223.00 |
| Expert Fees | $ 125,433.29 |
| Research/Discovery | $102.40 |
| Mediation/Arbitration | $ 7,693.75 |
| Sheriff/Service Fees | $ 70.62 |
| Transcripts | $ 11,600.85 |
| Travel | $3,969.80 |
| Postage/Delivery | $212.65 |
| **Total Expenses** | **$ 149,306.36** |

**VII. Information About the Case Contribution Award**

44. Class Counsel has requested that the Court award a case contribution award to Mr. Berube of up to $5,000. That amount would reduce the amount awarded for attorney's fees.

45. As set forth in his deposition, Mr. Berube has been an active participant in the litigation from the outset, providing documents to Plaintiff's counsel, reviewing court filings and consulting with counsel when the Settlement was being negotiated and being deposed. Dkt. 57-2. The case could not have been litigated without Mr. Berube. His efforts on behalf of all members

of the Class deserve compensation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of January 2024 in West Hartford, Connecticut.

/s/ *Robert A. Izard*
Robert A. Izard